1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA, et al.,        No.  2:09-cv-3617-KJM-EFB
     ex rel. JOHN DOE, RELATOR,
12
                   Plaintiffs,
13                                            ORDER
            v.
14
     BIOTRONIK, INC., et al.,
15
                   Defendants.
16

17

18          Attorney Mychal Wilson represented relator Brian Sant in this False Claims Act

19   case against Biotronik, Inc.  The case settled more than a year ago.  Biotronik agreed to pay

20   Sant's attorneys' fees and costs as required by statute, but Wilson and Biotronik have not reached

21   an agreement on the amount due.  In the intervening months they have waged a campaign of

22   angry motion practice, discovery disputes, and last-minute *ex parte* applications.  On April 22,

23   2015, the court took Wilson's motion for fees and costs under submission without hearing oral

24   arguments.  For the reasons described below, the motion is granted in part.

25          Several ancillary matters also remain pending: (1) Biotronik's *ex parte* application

26   to strike Wilson's reply brief, ECF No. 161; (2) Biotronik's request to permanently seal Wilson's

27   response to that *ex parte* application, submitted *in camera*; (3) Biotronik's amended request to

28   permanently seal or redact Wilson's reply brief, submitted *in camera*; (4) Wilson's *ex parte*

                                              1

1 application for leave to file a reply brief in excess of page limits, ECF No. 155; and (5) Wilson's

2 *ex parte* application for an extension of time to oppose Biotronik's *ex parte* application to strike

3 his reply brief, ECF No. 164.  The court addresses each below.

4 I.      GENERAL BACKGROUND

5       Relator Brian Sant, a Biotronik employee, filed his *qui tam* complaint on

6 December 31, 2009, alleging Biotronik's liability under the False Claims Act (FCA), 31 U.S.C.

7 §§ 3729, *et seq.*, and a number of related state statutes.  *See generally* Redacted Compl., ECF

8 No. 85.  Mr. Sant alleged that Biotronik and another company, Western Medical, Inc., had bribed

9 doctors to implant Biotronik's medical devices.  *See, e.g., id.* ¶ 2.  The complaint also alleged

10 Biotronik promoted off-label uses of its devices.  *See, e.g., id.* ¶ 4.  In all the complaint lists

11 twenty-eight "counts."  *See generally id.*  Both Wilson and attorneys from the firm Kershaw

12 Cutter & Ratinoff, LLP (KCR) represented Sant at the time.  *Id.* at 92.

13       On May 14, 2014, the United States intervened and informed the court it had

14 reached a settlement agreement with Biotronik and Sant, but only with respect to claims

15 predicated on certain "covered conduct."  ECF No. 51.  In short, the agreement refers only to

16 claims that Biotronik awarded doctors "repeated meals at expensive restaurants and monthly

17 payments for membership on a physician advisory board without proper documentation of any

18 specific work performed," all essentially in return for implanting Biotronik's devices.  Settlement

19 Agreement, Myers Decl. Ex. 1, Recital E, ECF No. 104-1.  Biotronik agreed to pay the United

20 States and certain states a combined $4.9 million.  *Id.* ¶ 1.  About $200,000 went to the states,

21 about $850,000 to Sant, and the balance to the United States.  *Id.* ¶¶ 1(a), 1(b), 2.  In the end,

22 Nevada was the only State to intervene.  On May 28, 2014, the United States, Nevada, and Sant

23 stipulated to the dismissal of the complaint in its entirety, Joint Stip. Dismiss., ECF No. 64, and

24 dismissal was entered on June 5, 2014, ECF No. 69.  As to Sant, the case was dismissed with

25 prejudice, and as to the United States, dismissal was with prejudice only as to the covered

26 conduct.  *Id.*

27       In the settlement agreement, Biotronik agreed to pay Sant's fees and costs in

28 addition to the amounts it agreed to pay to the United States, Nevada, and Sant:

> Relator and his attorneys have a claim for attorney's fees and costs and will present the claim for fees and costs incurred in the prosecution of this action to Biotronik.   Relator's claim for attorney's fees and costs is not released herein.   Biotronik acknowledges the claim and agrees to pay the fees and costs that Relator is statutorily entitled to separate and apart from its payment to the United States under this agreement.

Settlement Agreement, Myers Decl. Ex. 1, ¶ 7, ECF No. 104-1.  The parties were unable to agree on a fee award, and on September 26, 2014, KCR filed a motion for attorneys' fees and costs. KCR Mot. Fees and Costs, ECF No. 80.  The hearing and briefing schedule were modified in expectation of Wilson's similar motion, filed on December 10, 2014.  Wilson Mot. Fees and Costs, ECF No. 91; Wilson Mem. P.& A. (Wilson Mem.), ECF No. 92.  Biotronik filed a consolidated opposition on January 9, 2015.  ECF Nos. 100, *corrected by* Errata, ECF Nos. 112, 112-1.  After another delay, the hearing was set for April 24, 2015, replies to be filed by March 27, 2015.  ECF No. 108.  In light of the discovery disputes described below and the parties' attempts at settlement, the reply deadline was delayed again to April 17, 2015.  *See* Minute Orders, ECF Nos. 129, 133.  KCR settled and withdrew its motion before its reply came due, ECF No. 134, but Wilson and Biotronik have been unable to settle.  Wilson filed a reply brief on April 17, 2015, ECF No. 153.

The court first addresses Biotronik's *ex parte* application to strike the reply, then turns to its requests to seal or redact, and finally addresses the principal motion.

II.      BIOTRONIK'S *EX PARTE* APPLICATION TO STRIKE WILSON'S REPLY BRIEF

Biotronik requests an order striking portions of Wilson's reply brief and its attachments.  *Ex Parte* App. Strike (App. Strike), ECF No 161.  Biotronik argues Wilson relies on new information and arguments for the first time in reply and attempts to circumvent page limits. *Id.* at 1–2.  Alternatively, Biotronik requests leave to address any new arguments and evidence in a sur-reply brief.  *Id.* at 11.  Wilson filed an opposition.[1]  ECF No. 161.

---

[1] The court grants in part Wilson's *ex parte* application for an extension of time *nunc pro tunc*, ECF No. 164, to the extent it considers the opposition here.

3

1    As a general rule, courts decline to consider information and arguments presented

2    for the first time in a reply brief. *See, e.g.*, *Stewart v. Wachowski*, No. 03-2873, 2004 WL

3    2980783, at *11 (C.D. Cal. Sept. 28, 2004) (collecting cases). This rule is designed to avoid

4    unfairly depriving the opposing party of a response. *See, e.g.*, *Fox v. Citicorp Credit Servs., Inc.*,

5    15 F.3d 1507, 1514 n.6 (9th Cir. 1994).

6    First, Biotronik cites Wilson's argument that "[t]he 'covered conduct' clause of the

7    settlement agreement was required by the Department of Justice . . . to preserve the government's

8    rights to pursue claims in subsequent litigation." Reply at 5; *see also* App. Strike at 3. This

9    argument fairly responds to Biotronik's opposition. *See, e.g.*, Opp'n at 2 (arguing the United

10   States elected not to settle claims unrelated to "covered conduct" because those claims lacked

11   merit). In any event, the reply does no more than state the obvious: the United States' release of

12   Biotronik from claims x, y, and z allows the United States to later pursue claims a, b, or c. The

13   court will consider this argument.

14   Second, Biotronik cites Wilson's supplemental declaration, which it argues

15   included unaired evidence and explanations of the underlying *qui tam* litigation. App. Strike 3–4.

16   This argument also fairly responds to Biotronik's opposition. *See, e.g.*, Opp'n 3–9 (recounting

17   the course of the *qui tam* litigation). Because Biotronik anticipated and addressed Wilson's

18   position, the court declines to strike the reply or allow a sur-reply on this ground. Nevertheless,

19   the reply brief essentially incorporates Wilson's declaration by citation and then only in the

20   margin. *See* Reply 4 & n.3. Parties may not shift substantive arguments from one document to

21   another to avoid overrunning page limits, and a filing may be stricken for violation of this rule.

22   *See United States v. Sierra Pac. Indus.*, No. 09-2445, 2012 WL 175071, at *1 (E.D. Cal. Jan. 20,

23   2012). The court has already allowed Wilson five additional pages in reply, ECF No. 149, but he

24   took six,[2] and yet did not include his rebuttal description in the body of his reply. The court

25   therefore disregards Wilson's description of the *qui tam* litigation submitted in his supplemental

26

27    [2] The court grants Wilson's *ex parte* request for the sixth additional page *nunc pro tunc*.
*See Ex Parte* Application, ECF No. 155.

28

4

1    declaration.  On a related note, Biotronik protests Mr. Friedman's account of his actions in the fee

2    litigation.  *See* App. Strike 3 & n.3.  To the extent Friedman's supplemental declaration argues his

3    time was reasonably expended, the court disregards it; the reply brief is the correct mode of

4    argument on this front.

5           Third, Biotronik requests the court strike Wilson's and Friedman's supplemental

6    timekeeping records.  *See* App. Strike 3–6, ¶¶ I.A.2, 3, 9, 10.  These supplemental records take

7    two forms.  First, exhibits attached to the reply briefing list hours reportedly expended in the fee

8    litigation.  *See generally* Friedman Suppl. Decl. Ex. A; Wilson Suppl. Decl. Ex. 5.  Wilson's and

9    Friedman's notes on their time expended in this litigation cannot have been conceived before

10   Biotronik's opposition, so the court considers them here.  Second, the reply briefing includes

11   Wilson's more detailed explanation for the time he expended in the *qui tam* litigation, Wilson

12   Suppl. Decl. Ex. 4.  This evidence is a reasonable response to Biotronik's opposition, which

13   contested his previously submitted time records for vagueness.  *See* Opp'n 24–25, 26–27.

14          Fourth, Biotronik requests the court strike any portion of Wilson's reply that

15   describes time expenditures and rates charged by Biotronik's attorneys in this litigation.  *See* App.

16   Strike 4.  This information was not a part of Wilson's or KCR's original motion.  It arose first

17   after Biotronik filed its opposition, which contested both KCR's and Wilson's rates, Opp'n 27–

18   38, and their total hours billed, *id.* at 13–27.  KCR then sought to compel production of

19   Biotronik's hourly rates, ECF Nos. 113, and Wilson joined the motion, *see* Joint Statement of

20   Discovery Dispute 1, ECF No. 117.  The assigned magistrate judge found these records subject to

21   discovery and ordered Biotronik to produce them.  Order Mar. 20, 2015, ECF No. 124.  KCR

22   settled before filing a reply, *see* Withdrawal, ECF No. 134, but Wilson's reply brief and exhibits

23   cite Biotronik's attorneys' hours billed and their hourly rates, Reply at 2, 11 n.13, 13–14, 15;

24   Friedman Suppl. Decl. ¶ 7; *id.* Exs. B, C.

25          KCR's and Wilson's timing has frustrated adjudication of a relatively modest post-

26   judgment dispute.  The motion-opposition-reply briefing apparatus was designed to avoid last-

27   minute *ad hoc* requests such as those pending here.  Nevertheless, at this stage only Wilson

28   remains in the fee litigation.  Biotronik has also amply responded in its application to strike, in the

1   discovery dispute, and in its requests to seal or redact.  The court declines to strike the reply or

2   allow a sur-reply on this ground.

3                   Fifth, Biotronik objects to Exhibit C of Mr. Friedman's supplemental declaration.

4   App. Strike 4.  Exhibit C summarizes Exhibit B, a record of Holland & Knight timekeeping

5   entries produced by Biotronik.  By presenting this chart for the first time in his reply, Wilson

6   deprives Biotronik of the opportunity to contest his summaries and descriptions.  The court

7   disregards Exhibit C.

8   III.    BIOTRONIK'S REQUEST TO SEAL OR REDACT

9                   Biotronik requests an order permanently sealing or redacting Wilson's reply brief

10  and attachments.  *See* Notice, ECF No. 168.  Biotronik has also requested an order sealing or

11  redacting Wilson's response to its *ex parte* application to strike.  *See* Notice, ECF No. 170.

12  Underlying both requests are the hourly rates and billing records of Biotronik's attorneys at

13  Holland & Knight, its firm in both the *qui tam* and fees litigation.

14          A.      Background

15                  On February 18, 2015, before KCR withdrew its motion for fees, it moved to

16  compel production of Biotronik's billing records and noticed a hearing before the assigned

17  magistrate judge.  ECF No. 113; E.D. Cal. L.R. 302(c).  The parties' dispute focused on two

18  related questions: (1) whether the number of hours Biotronik's lawyers have billed in this dispute

19  is relevant to the fee motions; and (2) whether the rates billed are relevant.  Order Mar. 20, 2015,

20  at 5, ECF No. 124.  The magistrate judge held a hearing on March 18 and soon after issued an

21  order granting the motion in part.  *Id.*

22                  First, because the number of hours billed by opposing counsel "can be a helpful

23  guide in determining the reasonableness of time spent on a particular task[]," the magistrate judge

24  determined those hours were relevant.  *Id.* at 7 (citing *Dem. Pty. of Wash. State v. Reed*, 388 F.3d

25  1281, 1287 (9th Cir. 2004)).  But at the hearing, Biotronik's counsel "explicitly committed . . .

26  that it does not dispute the reasonableness of the number of hours spent on any particular tasks."

27  *Id.* at 8.  Rather, Biotronik argued "the only dispute is whether certain tasks relate to the claims

28  covered by the settlement agreement."  *Id.*  The magistrate judge agreed the parties did not

1    "dispute . . . whether excessive time was spent on any particular task," except as argued in pages

2    42 to 46 of Biotronik's opposition.  *Id.* at 8–9.  In those pages Biotronik contests the time KCR

3    and Wilson have spent litigating the pending motions for fees and costs.  *See* Opp'n section

4    VII.A, at 42–43.  Therefore the magistrate judge ordered Biotronik to produce only its billing

5    statements for work performed during the current fee dispute.  *Id.* at 9.  Second, he determined the

6    rates Holland & Knight charges its clients for work in this district was relevant to the

7    determination of a reasonable hourly rate in the Sacramento division.  *Id.* at 10 (citing, *inter alia*,

8    *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992)).  He therefore found these hourly

9    rates were relevant and discoverable if they were charged for work performed in this case.  *Id.* at

10   10–11.

11           On April 6, 2015, after KCR settled, Wilson filed an *ex parte* application to

12   enforce the magistrate judge's March 20, 2015 discovery order.  ECF No. 135.  Biotronik

13   opposed the request, ECF No. 141, and Wilson replied, ECF No. 142.  The magistrate judge

14   denied the request and ordered Biotronik to produce the documents required by his March 20,

15   2015 order subject to a stipulated protective order filed the same day.  Order Apr. 10, 2015, ECF

16   No. 147; Stip. Protective Order, ECF No. 146.  The stipulated protective order allowed both

17   Biotronik and Wilson to mark documents "Confidential" or "Highly Confidential – Attorneys'

18   Eyes Only."  Stip. Protective Order 1–2.  Documents so designated could "be used or disclosed

19   solely for the purpose of the prosecution or defense of this litigation, including preparing for and

20   conducting pre-trial, trial and post-trial proceedings in this litigation, and for no other purpose."

21   *Id.* at 3–4.

22           On Friday, April 17, 2015, the day Wilson's reply brief was due, and before the

23   reply was filed, Biotronik filed an *ex parte* application requesting the reply be temporarily sealed

24   if it included references to Holland & Knight's billing records.  ECF No. 152.  Biotronik

25   explained it had produced these billing records subject to the stipulated protective order and had

26   marked them as "Confidential."  *Id.* ¶ 5.  Biotronik also explained that Wilson had informed

27   Biotronik he would rely on those confidential records in his reply and would file them as

28   supporting exhibits.  *Id.* ¶ 6.  After Wilson filed his reply brief, which included argument on the

1   basis of Holland & Knight's billing records and attached those records as exhibits, the court

2   granted Biotronik's request in part, and the reply brief and its attachments were temporarily

3   sealed pending a final determination.  Minute Order, ECF No. 160.  Biotronik was ordered to file

4   an amended request to seal or redact *in camera*, identifying any confidential or privileged

5   information to be sealed or redacted and the grounds for sealing and redaction, and Wilson was

6   allowed an opposition.  *Id.*

7       Biotronik amended its request *in camera*, and Wilson opposed the amended

8   request.[3]  Biotronik's amended request proposes several redactions to the reply brief and

9   supplemental Friedman declaration: it would obscure any reference to Holland & Knight's hourly

10  rates, the hours it expended, and information that could algebraically reveal those rates or hours.

11  Biotronik also requested the permanent sealing of Exhibits B and C to the supplemental Friedman

12  declaration, which list in detail several Holland & Knight timekeeping entries.  Wilson essentially

13  argues attorney billing records are relevant, commonly filed publicly, and not subject to sealing or

14  redaction.

15      B.   Legal Standard

16      The common-law "right to inspect and copy judicial records is not absolute."

17  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978).  A litigant may request court records

18  be sealed or redacted.  *See id.* (listing traditional examples).  In the Ninth Circuit, courts faced

19  with requests to seal or redact begin "with a strong presumption favor of access to court records."

20  *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003).  The party seeking

21  to seal or redact a document "bears the burden of overcoming this strong presumption" by

22  "articulat[ing] compelling reasons supported by specific factual findings that outweigh the

23  general history of access and the public policies favoring disclosure, such as the public interest in

24  understanding the judicial process."  *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172,

25  1178 (9th Cir. 2006) (quoting *Foltz*, 331 F.3d at 1135; *San Jose Mercury News, Inc. v. U.S. Dist.*

26

27      [3] Biotronik also submitted a reply *in camera*.  The court's order did not anticipate or permit that filing.  The court has reviewed it and concludes Biotronik's arguments in reply would lead to no change in this order.

28

1  *Ct.*, 187 F.3d 1096, 1102–03 (9th Cir. 1999); and *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th

2  Cir. 1995)) (quotation marks and alterations omitted).  Hypothetical or conjectural harm are not

3  compelling reasons.  *Hagestad*, 49 F.3d at 1434.  Commonly cited "compelling reasons" include

4  the need to avoid "private spite," "public scandal," and to prevent a court's records from

5  becoming "reservoirs of libelous statements for press consumption," or "sources of business

6  information that might harm a litigant's competitive standing."  *Nixon*, 435 U.S. at 598 (citations

7  and internal quotation marks omitted).

8           The Ninth Circuit has repeatedly confirmed, however, that the traditional

9  compelling-reasons standard applies only "to dispositive pleadings, including motions for

10 summary judgment and related attachments."  *Kamakana*, 447 F.3d at 1179 (citing *Foltz*, 331

11 F.3d at 1136 and *San Jose Mercury News*, 187 F.3d at 1102).  The "usual presumption of the

12 public's right of access is rebutted" "for a *sealed discovery document* attached to a *non-*

13 *dispositive motion*."  *Id.* (quoting *Phillips v. General Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir.

14 2002) (quotation marks and alterations omitted) (emphasis in *Kamakana*).  Rather than

15 "compelling reasons," only "good cause" to withhold the information must be shown.  *Id.* at

16 1180.  This exception is meant to preserve a district court's "broad power . . . to fashion

17 protective orders."  *Phillips*, 307 F.3d at 1213.  It also recognizes that many discovery documents

18 "may be unrelated, or only tangentially related, to the underlying cause of action," *Seattle Times*

19 *Co. v. Rhinehart*, 467 U.S. 20, 33 (1984), and inconsistent rules would stymie discovery, *see*

20 *Foltz*, 331 F.3d at 1137–38.

21          Although the good-cause standard is less exacting than the compelling-reasons

22 standard, *see Kamakana*, 447 F.3d at 1180, the party seeking to seal or redact a record must show

23 what "specific prejudice or harm will result if no protective order is granted," *Foltz*, 331 F.3d at

24 1130.  Broad and unsupported allegations will fall short.  *Beckman Indus., Inc. v. Int'l Ins. Co.*,

25 966 F.2d 470, 476 (9th Cir. 1992).

26          C.    Discussion

27          As a preliminary matter, Biotronik's fee arrangements are not privileged, and the

28 billing records may not be sealed or redacted as such.  *See United States v. Blackman*, 72 F.3d

9

1418, 1424 (9th Cir. 1995). Biotronik implicitly concedes this point and has in any event already removed any nonresponsive or privileged information from the billing records in question. *See* Suppl. Friedman Decl. Ex. B.

The good-cause standard is applicable to Biotronik's request because the records in question are (1) subject to an earlier protective order and (2) attached to a non-dispositive motion. First, Holland & Knight's billing records were produced subject to a protective order entered by the magistrate judge and marked "Confidential." *See* Stipulated Protective Order, ECF No. 146; Suppl. Friedman Decl., Ex. B. And second, a motion for attorneys' fees is not a dispositive motion. *See U.S. ex rel. Shutt v. Cmty. Home & Health Care Servs., Inc.*, 550 F.3d 764, 766 (9th Cir. 2008) ("The determination of the relator's share of an FCA award, like the award of attorney's fees, raises factual issues 'collateral to the main action' because it involves a factual inquiry distinct from one addressing the merits.'" (quoting *Int'l Assoc. of Bridge Local Union 75 v. Madison Indus., Inc.*, 733 F.2d 656, 659 (9th Cir. 1984))); *see also, e.g., Digital Reg of Texas, LLC v. Adobe Sys., Inc.*, No. 12-1971, 2015 WL 604055, at *1 (N.D. Cal. Feb. 11, 2015) ("The documents sought to be filed under seal in this case are related to motions for attorneys' fees, a non-dispositive motion."). Wilson's citation of Federal Rule of Civil Procedure 54(d)(2)(D) in counterargument is unpersuasive.[4] That rule implicitly recognizes motions for attorneys' fees are non-dispositive and undermines his position.

To argue good cause supports the request to seal, Biotronik relies on the *in camera* declarations of its lead outside counsel, Christopher Myers, and its corporate counsel, James Maldonado. Myers describes Holland & Knight's negotiations with Biotronik as "extensive," and reports that the rates Biotronik pays Holland & Knight attorneys are not Holland & Knight's standard hourly rates. He avers both Holland & Knight and Biotronik treat billing records as

---

[4] Rule 54 provides that a district court may, "[b]y local rule, . . . establish special procedures to resolve fee-related issues without extensive evidentiary hearings. Also, the court may refer issues concerning the value of services to a special master under Rule 53 without regard to the limitations of Rule 53(a)(1), and may refer a motion for attorney's fees to a magistrate judge under Rule 72(b) as if it were a dispositive pretrial matter." Fed. R. Civ. P. 54(d)(2)(D).

1    confidential information.  He believes disclosure of Holland & Knight's discounted rates would

2    hamper the firm's financial relationships with other clients and provide cannon fodder to the

3    firm's competitors.  Maldonado agrees Biotronik treats its invoices confidentially and that the fee

4    arrangement for this case was specifically negotiated.  He believes disclosure of the rates

5    Biotronik pays Holland & Knight would impair its negotiations with other firms.  His declaration

6    also generally describes "a significant legal matter" in which Biotronik now pursues settlement,

7    and he believes disclosure of Biotronik's obligations to Holland & Knight in this case may derail

8    those negotiations.  On a similar note, he reports that Biotronik is currently litigating disputes

9    with one of its three principle competitors and that disclosure of amounts owed to Holland &

10   Knight here would put the firm at a disadvantage in those cases.  His declaration provides no

11   more detailed explanation.

12           As Wilson argues, attorneys' fees and the number of hours expended in a

13   particular litigation are commonly disclosed in public.  In *Linex Techs., Inc. v. Hewlett-Packard*

14   *Co.*, for example, Hewlett Packard argued that public disclosure of attorney billing records

15   "would competitively disadvantage HP and [its law firm] in negotiating future fee agreements

16   with firms or clients."  No. 13-159, 2014 WL 6901744, *1 (N. D. Cal. Dec. 8, 2014).  This

17   justification fell short of a "'particularized showing' of harm."  *Id.* (quoting *Foltz*, 331 F.3d at

18   1131); *see also, e.g.*, *Muench Photography, Inc. v. Pearson Educ., Inc.*, No. 12-1927, 2013 WL

19   6698465, at *2 (N.D. Cal. 2013) ("Billing rates for legal services, even discounted ones, are not

20   entitled to be sealed."), *appeal dismissed* (Apr. 17, 2014).  In some particular brands of litigation,

21   a court might be persuaded to protect billing records, but not on the facts here.  *See, e.g.*, *E & J*

22   *Gallo Winery v. Proximo Spirits, Inc.*, No. 10-00411, 2012 WL 1635190, at *1 (E.D. Cal. May 8,

23   2012) (competitively sensitive attorney billing rates may be subject to seal in trademark and trade

24   dress cases).

25           In this instance, Biotronik has offered no particularized explanation of harm.  Its

26   attorneys' declarations sketch only rough outlines of hypothetical competitive and litigation

27   difficulties.  The same harms could befall any large corporation that employs any large law firm.

28   The court is unpersuaded by Biotronik's attempts to distinguish its position from litigants in other

1   cases.  Biotronik correctly notes that unlike the movants in *Linex*, *Muench*, and similar cases,

2   Biotronik opposes the fee award.  Wilson therefore bears the "burden of documenting the

3   appropriate hours expended in the litigation"; he, not his opponent, "must submit evidence in

4   support of those hours worked."  *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992).

5   Nevertheless, these arguments go to the overall relevance of Biotronik's fees and do not show

6   particularized harm outweighing the public's interest in court records.  To the extent the District

7   of Arizona reached a contrary conclusion in *Medicis Pharmaceutical Corp. v. Acella*

8   *Pharmaceuticals, LLC*, this court disagrees.  *See* No. 10-1780, 2012 WL 2260928, at *2 (D. Ariz.

9   June 15, 2012).  Moreover, in that case, the parties' requests reached far beyond attorney billing

10   records, to damages, deposition transcripts and a slew of other documents, and the court denied

11   the request for attorneys' fees entirely.  *See id.* at *2, 6.

12   Biotronik's request to permanently redact or seal is denied.  The temporary seal of

13   Wilson's Reply Brief, ECF No. 153, the supplemental Friedman declaration, ECF No. 154,

14   supplemental Wilson declaration, ECF No. 156, and Wilson's reply to Biotronik's *ex parte*

15   request to strike, ECF No. 167, is lifted.

16   IV.   <u>MOTION FOR FEES</u>

17        A.   <u>Background</u>

18   Mychal Wilson is a 2003 law graduate who operates a solo law practice in Los

19   Angeles.  Wilson Decl., ¶ 1–4, ECF No. 97.  Wilson admitted to the California bar in 2005.  *Id.*

20   ¶ 1.  His practice encompasses both *qui tam* and entertainment law.  *Id.* ¶ 47.  He has experience

21   as a relator, *id.* ¶¶ 12–13, representing relators in *qui tam* actions, *e.g.*, *id.* ¶¶ 6–7, 16, 23, and

22   litigating copyright infringement actions, *id.* ¶ 47.  Wilson also has worked as a cardiovascular

23   sales representative for a large pharmaceutical company, *id.* ¶ 10, and as an actor, appearing in

24   television shows, commercials, and movies, ¶ 47, including playing "the role of a divorce

25   attorney on the hit WE tv reality show Marriage Boot Camp: Bridezillas," *id.*  He has submitted

26   the declaration of his fee counsel, Mr. Friedman, a 1987 law graduate who was admitted to the

27   Illinois state bar in 1988 and the California bar in 1989.  Friedman Decl. ¶ 2, ECF No. 93.  Mr.

28   Friedman has practiced law in the civil rights and FCA spheres since 1989.  *Id.* ¶ 3.  His practice

1    has long included both FCA *qui tam* litigation and attorneys' fee litigation.  *Id.* ¶¶ 6–7.  Wilson

2    requests fees for 1,005.75 hours worked at $550 per hour, in total $553,162.50.  Wilson Mem.

3    at 14.  Wilson also requests the court double this lodestar amount and award his fees spent

4    litigating this fee dispute: 140.5 of his own hours, billed at $550; and 307.1 hours billed by his fee

5    counsel at $750 per hour.  Friedman 2d Suppl. Decl. Ex. B, ECF No. 169-2.

6             In support of his request, Mr. Wilson describes his role in the case: he drafted the

7    complaint and disclosure statement; prepared his client Mr. Sant, the relator, for interviews,

8    conducted interviews of Biotronik employees and physicians, reviewed documents, prepared

9    fraud reports and presentations, responded to a motion to seal, reviewed and redacted the

10   complaint, and has worked to pursue his fees.  Wilson Mem. at 2–4.  He describes his expertise in

11   *qui tam* lawsuits, particularly in the pharmaceutical and medical device industries.  *Id.* at 2.  He

12   submits his results in the *qui tam* litigation were excellent considering the difficult subject matter,

13   fierce opposition, and foregone alternative employment.  *Id.* at 10–12.

14            As noted above, Biotronik opposes Wilson's motion.  In its estimation, Wilson's

15   time in this case was expended unreasonably.  It argues Sant was largely unsuccessful, recovering

16   $4.9 million when the complaint, in Biotronik's view, sought well over $100 million.  Opp'n 11–

17   12.  Although the complaint alleged a national scheme, Biotronik notes that of all the states

18   named, only Nevada intervened and participated in the settlement.  *Id.* at 1–2.  And although the

19   complaint alleges Biotronik's culpability in a wide variety of fraudulent schemes, in the end, only

20   two theories survived the investigation.  *Id.* at 5–6.  Biotronik claims it—not KCR and not

21   Wilson—pushed the government's investigation forward: Biotronik agreed to cooperate,

22   produced documents, negotiated in good faith, and agreed to settle.  *Id.* at 3–9.  Biotronik also

23   suggests Wilsons' reported expertise proved unnecessary; the work required of him was simple,

24   limited largely to reviewing documents and acting as government-relator liaison.  *Id.* at 38.

25   Wilson contests each of these points in reply.  *See* Reply, ECF No. 153.

26        B.    <u>Legal Standard</u>

27            The FCA "provides for an award of attorney fees to successful plaintiffs."

28   *Gilbrook v. City of Westminster*, 177 F.3d 839, 873 (9th Cir. 1999) (citing 31 U.S.C.

1    § 3730(d)(1)).  These fees must be "reasonable."  31 U.S.C. § 3730(d)(1).  The Supreme Court

2    has described a commonsense "starting point" for a court faced with the question of reasonable

3    fees: "the number of hours reasonably expended on the litigation multiplied by a reasonable

4    hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  This starting point is the fee

5    "lodestar." *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 901 (9th Cir. 1995).

6              Although *Hensley* was decided in the context of 42 U.S.C. § 1988, federal courts

7    commonly apply its reasoning in FCA cases.  *See, e.g.*, *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d

8    337, 356–57 (4th Cir. 2009); *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 616 (6th Cir. 2007); *Neal*

9    *v. Honeywell, Inc.*, 191 F.3d 827, 833 (7th Cir. 1999).  *See also Pfingston v. Ronan Eng'g Co.*,

10   284 F.3d 999, 1005–06 & n.4 (9th Cir. 2002) (citing the FCA's legislative history to find section

11   1988 cases "instructive" for FCA fee awards).  The fee applicant must first carry his burden to

12   submit evidence in support of his request.  *Deukmejian*, 987 F.2d at 1397.  The fee opponent then

13   bears the burden of rebuttal, and may submit evidence to show the requested fee is not

14   reasonable.  *Id.* at 1397–98.  The court may consider a variety of factors when computing the

15   lodestar rate:

16                  (1) the time and labor required; (2) the novelty and difficulty of the
                 questions involved; (3) the skill requisite to perform the legal
17               service properly; (4) the preclusion of other employment by the
                 attorney due to acceptance of the case; (5) the customary fee; (6)
18               whether the fee is fixed or contingent; (7) time limitations imposed
                 by the client or the circumstances; (8) the amount involved and the
19               results obtained; (9) the experience, reputation, and ability of the
                 attorneys; (10) the undesirability of the case; (11) the nature and
20               length of the professional relationship with the client; and (12)
                 awards in similar cases.
21

22   *Carter v. Caleb Brett LLC*, 757 F.3d 866, 869 (9th Cir. 2014) (citation and internal quotation

23   marks omitted).

24              Ascertaining a reasonable fee is an inexact science; mimicking "the intricacies of

25   the fee-paying market in every respect" is neither required nor possible.  *City of Burlington v.*

26   *Dague*, 505 U.S. 557, 566–67 (1992).  The decision is a matter of discretion, *Schwarz*, 73 F.3d at

27   900, but must be accompanied by a "concise but clear explanation" of reasons, *Hensley*, 461 U.S.

28   at 437.

1        C.        Discussion

2               Wilson has submitted records of his time over the course of the *qui tam* litigation,

3    Wilson Decl. Ex. 3, ECF No. 97; Wilson Suppl. Decl. Ex. 4, ECF No. 156.  The court has

4    reviewed these records and finds Wilson's time was largely spent reasonably, but some

5    reductions are in order "to reflect [Sant's] limited degree of success, to account for block billing,

6    [and] to deduct those hours the court deems excessive."  *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d

7    754, 763 (9th Cir. 2015), *cert. denied*, ___ U.S. ___ (Oct. 15, 2015) (citations omitted).  After

8    describing these reductions, the court determines a reasonable hourly rate, declines to adopt a

9    multiplier, determines a reasonable award of Wilson's fees in the fee litigation, and awards costs.

10                    1.        Reductions for Lack of Success

11               A court may reduce a fee award if the applicant was not wholly successful.

12    *Schwarz*, 73 F.3d at 905–06; *see also Ryan*, 786 F.3d at 764 ("The district court . . . was . . . in

13    fact required[ ] to analyze whether [the movant] achieved only limited success in the underlying

14    litigation and how her requested fee award should be reduced to account for her limited degree of

15    success.").  Just as in the case of a claim for fees under § 1988, the FCA awards fees only to

16    successful claimants.  *Compare* 42 U.S.C. § 1988(b) (allowing an award of fees to "the prevailing

17    party") *with* 31 U.S.C. § 3730(d) (awarding fees only to those who recover "proceeds of the

18    action or settlement"); *see also Gilbrook v. City of Westminster*, 177 F.3d 839, 873 (9th Cir.

19    1999) (The FCA "provides for an award of attorney fees to successful plaintiffs.").  "This

20    conclusion follows largely from *Hensley* itself, where the Supreme Court noted that '[a] reduced

21    fee award is appropriate if the relief, however significant, is limited in comparison to the scope of

22    the litigation as a whole.'"  *McCown v. City of Fontana*, 565 F.3d 1097, 1103 (9th Cir. 2009)

23    (quoting *Hensley*, 461 U.S. at 440) (alterations in *McCown*) (footnotes omitted).

24               The court takes care, however, not to second-guess the maneuvers of successful

25    counsel: "plaintiffs are to be compensated for attorney's fees incurred for services that contribute

26    to the ultimate victory in the lawsuit.  Thus, even if a specific claim fails, the time spent on that

27    claim may be compensable, in full or in part, if it contributes to the success of other claims."

28    *Cabrales v. Cty. of L.A.*, 935 F.2d 1050, 1052 (9th Cir. 1991).  "'By and large, the [district] court

1    should defer to the winning lawyer's professional judgment as to how much time he [or she] was

2    required to spend on the case.'"  *Ryan*, 786 F.3d at 763 (quoting *Moreno v. City of Sacramento*,

3    534 F.3d 1106, 1112 (9th Cir. 2008)) (alterations in *Ryan*).  A court must ask "whether the

4    'unsuccessful claim arises from the same core of facts as the successful claim and whether it is

5    likely that some of the work performed in connection with the unsuccessful claim also aided the

6    work done on the merits of the successful claim.'"  *Schwarz*, 73 F.3d at 903 (quoting *Herrington*

7    *v. Cty. of Sonoma*, 883 F.2d 739, 747 (9th Cir. 1989)) (alterations omitted).

8              Here, the *qui tam* complaint alleged a broad range of wrongful conduct: bribes in

9    the form of paid speaking engagements, Redacted Compl. ¶ 4; promotion of unapproved medical

10   devices, *id.*; promotion of unnecessary devices, *id.* ¶ 5; incentives to encourage employees to

11   further the alleged kickback scheme, *id.* ¶ 21; creation of a "speakers bureau" and "advisory

12   boards" meant to funnel illegal payments to physicians, *id.* ¶ 34; "[p]ayment for sham 'studies'

13   and 'training,'" *id.* ¶ 38; bribes disguised as "research payments," *id.* ¶ 39; bribes in the form of

14   "outdoor sports activities, gift cards, expensive meals, tickets to professional sports games,

15   Broadway plays, and the opera," *id.* ¶ 54; bribes of "resort-style travel destinations," *id.* ¶ 58;

16   submission of "billings for Biotronik . . . devices that were ineligible for reimbursement under

17   Medicaid and Medicare because the devices were used for an off-label purpose," *id.* ¶ 93; and the

18   use of "off-label information to persuade physicians to use Biotronik devices," *id.* ¶ 98.  It alleged

19   claims on behalf of the United States, twenty-three states, and the District of Colombia.  *Id.*

20   at 1–2.

21             In the settlement agreement, Sant agreed to dismiss all of his claims, and the

22   settlement was limited to claims arising out of only the "covered conduct": "repeated meals at

23   expensive restaurants and monthly payments for membership on a physician advisory board

24   without proper documentation of any specific work performed."  Settlement Agreement, Myers

25   Decl. Ex. 1, Recital E, ECF No. 104-1.  Of the twenty-five jurisdictions named in the complaint's

26   caption, only the United States and Nevada participated.  Because the scope of the *qui tam*

27   complaint markedly exceeded the scope of the eventual settlement agreement, Sant was not

28   entirely successful.  Many of his claims also are dissimilar and cannot have arisen from the same

1   "core of facts"; consider, for example, the successful claims related to lavish meals as compared

2   to allegations of off-label uses of medical devices and the promotion of unnecessary devices.  At

3   the same time, the nature of a lawyer's work prevents the easy division of tasks between those

4   performed in the pursuit of successful and unsuccessful claims.  Balancing these considerations,

5   the court applies a 20 percent reduction to the total hours billed.

6                              2.      Unnecessary Tasks and Vague Entries

7                    District courts evaluating FCA fee claims may also decline to award fees for time

8   spent on ancillary or unnecessary tasks.  *See, e.g.*, *United States ex rel. Thompson v. Walgreen*

9   *Co.*, 621 F. Supp. 2d 710, 717–26 (D. Minn. 2009) (reducing the award for time spent speaking

10   with attorneys general from non-intervening states, on employment and tax matters, and for time

11   spent interacting with media).[5]  Similarly, a court may reduce any "excessive, redundant, or

12   otherwise unnecessary hours," *Hensley*, 461 U.S. at 434, or may reduce an award for a lack of

13   necessary detail, *see id.* at 437 ("The applicant . . . should maintain billing time records in a

14   manner that will enable a reviewing court to identify distinct claims"); *see also Welch v. Metro.*

15   *Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007) (recognizing a district court's "authority to reduce

16   hours that are billed in block format").  When a district court imposes such reductions, it "must

17   'explain how or why the reduction fairly balances' those hours that were actually billed in block

18   format and how it determined the percentage of reduction to apply.  *Ryan*, 786 F.3d at 766

19   (quoting *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007)) (alterations omitted).

20                    Here, Wilson's timekeeping records support a modest overall reduction.  For

21   example, he documents time spent on Sant's employment with Biotronik and communicating

22   with attorneys general from non-intervening states.  *See generally* Wilson Suppl. Decl. Ex. 3.

23

24                    [5] Wilson's attempt to distinguish this and similar cases falls flat.  *See, e.g.*, Reply 8–9 &
n.10.  In the Ninth Circuit, a district court has discretion to award the entirety of a fee, even for
25   time litigating other matters.  *See, e.g.*, *Watson v. Cnty. of Riverside*, 300 F.3d 1092, 1097 (9th
Cir. 2002) ("[I]t was within the district court's discretion to award all fees . . . ."); *S.F. NAACP v.*
26   *S.F. Unified Sch. Dist.*, 284 F.3d 1163, 1166 (9th Cir. 2002) ("[A] fee award is not precluded in
these circumstances.").  *Watson* and *NCAAP* allow a court discretion to award the whole fee, but
27   do not compel that decision.

28

1     Many of Wilson's time entries also telegraph dubious and vaguely described expenditures of

2     time, for example dozens of fifteen-minute time-blocks described by the phrase "Client Text

3     Messages" or "Client Phone Call." *Id.* Other tasks could have been better delegated to a non-

4     attorney or billed at the rate of a junior attorney. *See, e.g., id.* (describing various lengthy periods

5     spent copying data from emails and other source documents to a database). Because these entries

6     comprise less than ten percent of the total hours Wilson expended, and because lawyers cannot be

7     required to waste time documenting their work in great detail, *see Yenidunya Investments, Ltd. v.*

8     *Magnum Seeds, Inc.*, No. 11-1787, 2012 WL 538263, at *10 (E.D. Cal. Feb. 17, 2012), *aff'd*, 562

9     F. App'x 560 (9th Cir. 2014), the court imposes a reduction of 5 percent of the hours billed after

10    reductions for lack of success. With the 20 percent overall reduction noted above, this 5 percent

11    reduction yields a combined reduction of 24 percent.[6] Wilson requests an award for 1,005.75

12    hours expended in the *qui tam* litigation. The court awards compensation for 764.37 of these

13    hours.

14             3.      Hourly Rate

15          "[D]etermining an appropriate 'market rate' for the services of a lawyer is

16    inherently difficult . . . ." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008)

17    (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n. 11 (1984)). A reasonable rate accounts for the

18    lawyer's "experience, skill, and reputation," *Schwarz*, 73 F.3d at 906, as would be rewarded in the

19    legal community in which the district court sits, *Blum*, 465 U.S. at 895; *Camacho*, 523 F.3d at

20    979; *Schwarz*, 73 F.3d at 906. To determine a reasonable rate, the Ninth Circuit approves

21    consideration of "[a]ffidavits of the plaintiffs' attorneys and other attorneys regarding fees in the

22    community" and rates paid in other cases, particularly to the applicant attorney. *United*

23    *Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990). The court may

24    resort to historically prevailing rates or current rates and may award current rates to adjust an

25    otherwise unreasonable award for inflation. *Schwarz*, 73 F.3d at 908.

26

27    ————————————————

28          [6] 95 percent of an 80-percent part is 76 percent of the total.

a)     <u>Skill, Experience, and Client Relationships</u>

An attorneys' "experience, reputation, and ability" and "the nature and length of [his] professional relationship with the client" may inform the district court's determination of a reasonable rate. *Carter*, 757 F.3d at 868 (quoting *Quesada v. Thomason*, 850 F.2d 537, 539 n.1 (9th Cir. 1988)) (quotation marks omitted).  Experience is often roughly measured in terms of the number of years a lawyer has been admitted to the bar. *See, e.g.*, *California Pro-Life Council, Inc., v. Randolph*, No. 00-1698, 2008 WL 4453627, *7 (E.D. Cal. Sept. 30, 2008).

Wilson is a 2003 graduate of the Southwestern University School of Law and was admitted to the bar in 2005.  Wilson Decl. ¶¶ 1, 4.  At the time Wilson began work on this case, he had been practicing for four years, *see* Wilson Suppl. Decl. Ex. 4.  He has experience both as a relator, *id.* ¶¶ 12–13 and representing relators in *qui tam* actions, *e.g., id.* ¶¶ 6–7, 16, 23.  His experience as a cardiovascular sales representative for a large pharmaceutical company, *id.* ¶ 10, is also relevant to this case.  His experience as an actor is not.  *Id.* ¶ 47.

Several declarations also accompany Wilson's motion: that of his fee counsel, Jeremy Friedman, ECF No. 93; of John Clark, ECF No. 94; of Michael Hirst, ECF No. 95;[7] and of Ross Brooks, ECF No. 96.  Messrs. Friedman, Clark, Hirst, and Brooks are lawyers with experience representing relators in *qui tam* litigation.  Friedman Decl. ¶ 6; Clark Decl. ¶ 4; Hirst Decl. ¶¶ 4–5, ECF No. 80-3; Brooks Decl. ¶ 1.  Each describes the nature of FCA litigation and states his belief that Wilson's requested rate, $550 per hour, is within the range of rates charged by *qui tam* counsel with similar experience and skill.  Friedman Decl. ¶ 10; Clark Decl. ¶ 10; Hirst Suppl. Decl. ¶ 6, ECF No. 95; Brooks Decl. ¶ 6.  Three attest that relators' counsel must often assume significant risk of receiving no payment.  Friedman Decl. ¶ 18; Clark Decl. ¶ 9; Brooks Decl. ¶ 4.  These declarations speak primarily to rates charged outside Sacramento, however.  Friedman Decl. ¶¶ 12–14; Clark Decl. ¶ 8; Brooks Decl. ¶ 3.  Only Mr. Hirst's declaration specifically addresses the Sacramento market.  Hirst Decl. ¶ 6.

---

[7] This declaration supplements Mr. Hirst's original declaration, submitted in support of KCR's motion.  ECF No. 80-3.

1    Biotronik attached the declaration of Steven Lewis to its opposition.  ECF

2  No. 102.  Mr. Lewis is a 1974 law graduate whose practice focuses on representation of attorneys

3  and law firms, including in fee disputes.  *Id.* ¶¶ 2–5.  In his experience, the prevailing market rate

4  for a partner practicing in this district varied between $225 and $495 per hour in 2010 and

5  between $250 and $525 per hour in 2014.  *Id.* ¶ 17.  Associates at similar firms generally charge

6  between $150 and $300 per hour in 2010 and between $200 and $325 per hour in 2014.  *Id.* ¶ 18.

7  In his opinion, prevailing rates for a lawyer with Wilson's credentials and experience would have

8  varied between $235 per hour and $325 per hour.  *Id.* ¶ 28.  Mr. Lewis's declaration does not

9  specifically account for differences between *qui tam* and other litigation.

10                  b)       Non-Local Rates

11    Wilson specifically requests the court calculate a reasonable fee with hourly rates

12  higher than those prevailing in this district for cases generally because "the marketplace for False

13  Claims Act legal services is national."  Wilson Mem. 8.  A district court has discretion to award

14  rates higher than the locally prevailing rate if a fee applicant proves local counsel was

15  unavailable, whether due to unwillingness, lack of experience, expertise, or specialization.

16  *Schwarz*, 73 F.3d at 907; *Deukmejian*, 987 F.2d at 1405.  Some district courts have entertained

17  the possibility that the market for capable FCA attorneys is national.  *See, e.g.*, *United States ex*

18  *rel. Liotine v. CDW-Gov't, Inc.*, No. 05-0033, 2013 U.S. Dist. LEXIS 138509 *16 (S.D. Ill. May

19  17, 2013).

20    On the record before it, this court declines to resort to extra-district rates here.

21  Wilson has not shown experienced and capable counsel was unavailable in Sacramento.  Sant

22  secured representation by KCR, a Sacramento firm, and Mr. Hirst likewise practices FCA

23  litigation within this district.  The court has also reviewed recent district-court FCA fee decisions

24  from several circuits; if anything, these decisions cast doubt on Wilson's argument for a national

25  market rate higher than $500 per hour.  *See, e.g.*, *U.S. ex rel. Doe v. Acupath Labs., Inc.*, No. 10-

26  4819, 2015 WL 1293019, at *1 (E.D.N.Y. Mar. 19, 2015) ($350 and $375 per hour for attorneys

27  with twenty and twenty-two years' experience, respectively); *U.S. ex rel. Peterson v. Sanborn*

28  *Map. Co., Inc.*, No. 11-902, 2014 WL 2815592, at *4 (E.D. Mo. June 23, 2014) ($350 per hour

1   for a lawyer with no experience representing relators); *U.S. ex rel. Young v. Somerset Farms, Inc.*,

2   No. 02-2846, 2014 WL 2048181, at *2 (E.D. Pa. May 16, 2014) ($300 per hour for a lawyer with

3   twenty-four years' experience); *U.S. ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 06-433, 2014

4   WL 691500, at *8 (S.D. Miss. Feb. 21, 2014) ($400 per hour for a lawyer with over twenty years'

5   experience).  Similarly, the court declines to adopt the rates billed by Holland & Knight attorneys

6   in this matter.  Those rates may be relevant, but they are not conclusive of the rates charged in

7   this district, and Wilson has not shown Holland & Knight's rates are typical of Sacramento.

8                               c)      Conclusion

9               Considering Wilson's experience, his solo law practice, the risk associated with

10  representation of relators in FCA litigation, and the specialized subject matter of this case, the

11  court concludes an hourly rate of $400 provides reasonable compensation.  This rate is at the top

12  of or higher than the range approved in this district for very experienced civil-rights litigators.

13  *See, e.g.*, *California Ass'n of Rural Health Clinics v. Douglas*, No. 10-00759, 2014 WL 5797154,

14  at *5 (E.D. Cal. Nov. 6, 2014) ("[C]ourts in the Eastern District have found $400 per hour

15  reasonable for highly qualified civil rights attorneys."); *Hunter v. Cnty. of Sacramento*, No. 06-

16  00457, 2013 WL 5597134, at *9 (E.D. Cal. Oct. 11, 2013) (collecting cases from 2009 to 2013

17  for attorneys with eleven or more years' experience to find a rate of $350 per hour was

18  reasonable).  The total lodestar rate is therefore $305,748.

19                      4.      Multiplier

20              In some cases, when attorneys have achieved "exceptional success," the lodestar

21  amount may be increased.  *Blum*, 465 U.S. at 897.  An upward adjustment is reserved for the

22  "rare case" in which the party seeking an award offers "specific evidence" of superior service

23  beyond that reasonably expected.  *Id.* at 899.  A multiplier may only be applied if the factors

24  relevant to the court's decision are not already "subsumed in the lodestar calculation." *Camacho*,

25  523 F.3d at 982 (citing *Kerr v. Screen Extras Guild, Inc.*, 526, F.2d 67, 69–70 (9th Cir. 1975),

26  which lists the factors described in *Carter*, *supra*, 757 F.3d at 868).

27              Wilson has presented no "specific evidence" of "exceptional success."  The court

28  has already considered the typical contingency nature of *qui tam* relator litigation, the nature of a

1    solo law practice, and the strength and depth of his professional relationship with relators and the

2    pharmaceutical industry.  The underlying *qui tam* litigation was procedurally straightforward.

3    Before inception of the fee litigation, this case involved no motion practice other than several

4    requests for extensions of time and to maintain a seal on the complaint.  *See* Order May 1, 2014,

5    ECF No. 49; Mot. Maintain Seal, ECF No. 60.  An independent multiplier would unreasonably

6    increase Wilson's award.

7            D.       Fees on Fees

8                    A court may award fees incurred litigating a fee dispute, that is, fees on fees.

9    *Davis v. City & Cnty. of San Francisco*, 976 F.2d 1536, 1544 (9th Cir. 1992), *vacated in part on*

10   *other grounds*, 984 F.2d 345 (9th Cir. 1993).  The same *Hensley* principles apply to such an

11   award.  *Thompson v. Gomez*, 45 F.3d 1365, 1368 (9th Cir. 1995).

12                   Wilson requests compensation for 140.5 of his own hours and 307.1 of Friedman's

13   hours litigating this motion.  Friedman 2d Suppl. Decl. Ex. B, ECF No. 169-2.  These are

14   considerable amount of time.  Nevertheless, "[l]itigation has something of the tennis game,

15   something of war, to it; if one side hits the ball, or shoots heavy artillery, the other side

16   necessarily spends time hitting the ball or shooting heavy artillery back."  *Dem. Party of Wash.*

17   *State v. Reed*, 388 F.3d 1281, 1287 (9th Cir. 2004).  Much of Wilson's and Friedman's time was

18   spent returning like fire from Biotronik, although not all of it.  Quite a few of their hours were

19   excessive.  KCR and Friedman did not seek discovery of Biotronik's rates until late in the game,

20   which caused considerable excess and last-minute motion practice, and many of Wilson's *ex*

21   *parte* filings were overlong.  Moreover, the court has awarded only about a third of the more than

22   $1 million in fees Wilson requested for the *qui tam* litigation.  The Ninth Circuit has even

23   affirmed reductions in fee-on-fee awards proportional to the amounts recovered in the underlying

24   litigation, which would suggest a reduction of approximately 70 percent would be within the

25   court's discretion.  *See Thompson v. Gomez*, 45 F.3d 1365, 1366–68 (9th Cir. 1995).  Having

26   reviewed Wilson's and Friedman's billing records, *see* Wilson Suppl. Decl. Ex. 5, ECF No. 156;

27   Friedman Suppl. Decl. Ex. A, ECF No. 154-1; Friedman 2d Suppl. Decl. Ex A, ECF No. 169-1,

28

                                                    22

1   the court concludes a 30 percent reduction of the fee litigation hours reasonably "trim[s] the fat"

2   in these circumstances. *Schwarz*, 73 F.3d at 906 (citation omitted).

3           Although $400 per hour is a reasonable rate for Wilson's time spent litigating the

4   *qui tam* action, it is not a reasonable rate for his time spent preparing the motion for fees.  His

5   expertise in cardiovascular sales and representing relators does not apply equally to a motion for

6   fees; he has described no expertise or experience preparing motions for fees.  An hourly rate of

7   $300 adequately compensates him for time preparing this motion.  Friedman, however, has many

8   years of relevant experience.  As described above, he is a 1987 graduate of the University of

9   Chicago Law School and has practiced civil rights, *qui tam*, and fee litigation for about twenty-

10  five years.  *See* Friedman Decl. ¶¶ 1–3.  He requests an hourly rate of $750, higher than that

11  recently charged and awarded in Sacramento, *see, e.g.*, Lewis Decl. ¶ 17 (reporting hourly rates of

12  up to $525 for partners at well-respected Sacramento firms), ECF No. 102; *Deocampo v. Potts*,

13  No. 06-1283, 2014 WL 4230911, at *5 (E.D. Cal. Aug. 25, 2014) (awarding fees on fees at $400

14  per hour).  Because Wilson has not shown willing and competent counsel was available only

15  outside Sacramento, Friedman's time is reasonably compensated at $550 per hour, a high rate for

16  an experienced litigator in this district in 2015.

17          Wilson is entitled to the recovery of 70 percent of his 140.5 hours billed at $300

18  per hour for his own time ($29,505) and 70 percent of 307.1 hours billed at $550 per hour for

19  Friedman's time ($118,233.50), in total $147,738.50.

20          E.      Costs

21          A successful *qui tam* relator is entitled to his reasonable costs.  31 U.S.C.

22  § 3730(d).  Wilson requests an award of $3,202 in costs, which the court concludes he reasonably

23  incurred for travel, lodging, and document production in the *qui tam* litigation.  *See* Wilson Decl.

24  Ex. 5, ECF No. 97.  Wilson has not sought reimbursement of costs in the fee litigation.

25  /////

26  /////

27  /////

28  /////

V.      <u>CONCLUSION</u>

The court awards Wilson $305,748.00 for attorneys' fees in the underlying *qui tam* action, $147,738.50 in attorneys' fees in the fees litigation, and $3,202.00 in costs, in total $456,688.50.

IT IS SO ORDERED.

DATED:  October 22, 2015.

_____
UNITED STATES DISTRICT JUDGE